**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re  FRANCES C. CHAN, | : | Chapter 7 |
| | : | |
| Debtor | : | Bky. No. 06-13521ELF |
| | : | |
| _____ | : | |
| | : | |
| DOROTHY PARK, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| FRANCES C. CHAN, | : | |
| | : | |
| Defendant | : | Adv. No. 06-00623ELF |

# M E M O R A N D U M

## I.  INTRODUCTION

In 2005, Plaintiff Dorothy Park ("the Plaintiff") invested $300,000.00 in the business of

the Defendant-Debtor Frances C. Chan ("the Debtor"), that business being a retail store called

"Her Royal Highness" ("HRH").  HRH retailed luxury lines of children's clothing.  Within

fourteen (14) months after receiving the Plaintiff's first installment on the investment, HRH

closed its doors and the Debtor filed for individual chapter 7 bankruptcy relief.

In this adversary proceeding, Plaintiff Dorothy Park ("the Plaintiff") asserts that the

Debtor fraudulently induced her to make the investment and seeks a determination that this debt

is excepted from discharge in the Debtor's chapter 7 bankruptcy case under 11 U.S.C. §§

523(a)(2)(A), 523(a)(2)(B), 523(a)(4), 523(a)(6) and 523(a)(19).   She also seeks a money

judgment against the Debtor for the amount of her investment, plus interest and punitive

damages.[1]

The Debtor contests her liability and the nondischargeability of the debt. She denies making misrepresentations. She also accuses the Plaintiff of being an overeager investor who ignored certain "red flags" that provided a clear signal regarding the investment risk prior to making the investment and who now is attempting to justify a poor investment decision by mischaracterizing the Debtor's pre-investment representations regarding HRH's financial condition.

The outcome of this dispute turns on two critical, disputed issues: whether the Debtor made pre-investment misrepresentations to the Plaintiff and whether the Plaintiff reasonably relied on the written financial information the Debtor provided to her.

For the reasons set forth below, I find that the Debtor's debt to the Plaintiff is nondischargeable pursuant to §523(a)(2)(B).[2]  However, the only relief that I will grant is a determination that the debt is nondischargeable. I decline to liquidate the debt or enter a money judgment in the Plaintiff's favor.


## II. <u>PROCEDURAL HISTORY</u>

On July 21, 2006, the Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania ("the District Court") against the Debtor contending, <u>inter</u> <u>alia</u>,

---

[1]      The Plaintiff asserts that, through the date of trial, her actual damages (including interest) total $346,950.67. <u>See</u> Plaintiff's Trial Mem. at 5. She also asserts that she is entitled to punitive damages. <u>Id.</u>

[2]      I need not and do not reach the Plaintiff's other claims under §523(a).

2

that the Debtor violated federal and state securities laws, committed fraud and breached her

fiduciary duty to the Plaintiff in connection with the Plaintiff's investment in HRH.  See Park v.

Chan, No. 06-3220 (E.D. Pa. July 21, 2006) ("the District Court Action").  Shortly thereafter, on

August 16, 2006, the Debtor filed a voluntary petition for bankruptcy relief under chapter 7 of the

Bankruptcy Code.  See In re Chan, No. 06-13521 (Bankr. E.D. Pa.).  The filing of the bankruptcy

petition automatically stayed the District Court Action.  See 11 U.S.C. §362(a).[3]

The Plaintiff commenced this adversary proceeding by filing a nine (9) count complaint

against the Debtor on November 20, 2006.  The Complaint included several claims arising under

non-bankruptcy law ("the Non-Bankruptcy Claims").[4]  The Debtor filed an Answer, Affirmative

Defenses, Counterclaim and Third Party Complaint on December 21, 2006.  See Adv. Docket

No. 4.  In her Counterclaim and Third Party Complaint, the Debtor asserted that claims existed

that "would be characterized as counterclaims against the Plaintiff, as well as third party

---

[3]        On September 1, 2006, the Plaintiff filed a Motion for Relief From the Automatic Stay
and for an Extension of the Deadline For Filing a Complaint Objecting to Discharge or to Determine
Dischargeability of Certain Debts ("the Motion for Relief") in the Debtor's main bankruptcy case.  The
Debtor contested the Motion for Relief.  On October 23, 2006, the Motion for Relief was denied in its
entirety.  See In re Chan, 355 B.R. 494 (Bankr. E.D. Pa. 2006).

[4]        The Non-Bankruptcy Claims were::

- Count V (Violation of Section 10(b) of the Securities Exchange Act of 1934,
  15 U.S.C. §78j(b) and Rule 10(b)-5)

- Count VI (Violation of Pennsylvania's Securities Act of 1972, 70 P.S. §1-
  101, et. seq.)

- Count VII (Common Law Fraud) and

- Count VIII (Breach of Fiduciary Duty).

See Adv. Docket No. 1.

complaints against companies owned and/or controlled by the Plaintiff," that such claims currently belonged to the chapter 7 trustee who was overseeing her bankruptcy estate, that she believed the trustee was in the process of determining whether to pursue those claims, and that, if the trustee did not raise them and they reverted back to her, she intended to raise them in litigation.  See id.  Shortly thereafter, on December 29, 2006, the Plaintiff filed a jury demand. See Adv. Docket No. 7.

Exercising its independent obligation to determine whether it had subject matter jurisdiction over the parties' asserted claims, see, e.g., In re Spree.com Corp., 295 B.R. 762 (Bankr. E.D. Pa. 2003), and after soliciting and receiving briefs from the parties, see Adv. Docket No. 13, 14, the court entered an Order dated February 15, 2007:

1.   abstaining from exercising jurisdiction over the Non-Bankruptcy Claims;

2.   striking the Plaintiff's Jury Demand on the remaining counts of the Complaint; and

3.   dismissing the Debtor's Counterclaim and Third Party Complaint without prejudice for lack of jurisdiction.

See Adv. Docket No. 16.

After the entry of the February 15, 2007 Order, left for determination at trial were the Plaintiff's claims in Counts I through V of the Complaint -- i.e., the nondischaregability claims arising under the Bankruptcy Code:  11 U.S.C. §§523(a)(2)(A), 523(a)(2)(B), 523(a)(4), 523(a)(6) and 523(a)(19).[5]

---

[5]        The Order also stated that nothing in it should be construed as limiting the court's discretion, or compelling the court, to liquidate the amount of any debt that might be determined to be nondischargeable.  See Adv. Docket No. 16, ¶4.  Subsequently, the Plaintiff filed a Motion with the District Court seeking a Withdrawal of Reference.  See District Court Docket No. 2:07-mc-00029-PD, Entry No. 1.  The District Court denied the Plaintiff's Motion on April 5, 2007..

The bench trial of this adversary commenced on February 8, 2008.  Three witnesses testified at trial:  the Plaintiff, the Debtor and Kaoru Takahashi, the Plaintiff's former bookkeeper.  Additionally, both sides introduced documents into evidence.[6]  Closing argument was heard on February 11, 2008.


### III.  <u>FINDINGS OF FACT</u>

Based on a preponderance of the evidence admitted at trial, <u>see</u> <u>Grogan v. Garner</u>, 498 U.S. 279, 286-91, 111 S.Ct. 654, 659-61  (1991),  I make the following findings of fact.[7]

---

[6]      Plaintiff admitted P-13 (HRH's general ledger for 2005), P-14 (Plaintiff's check for $150,000.00 and wire transfer for $150,000.00), P-18 (Plaintiff's e-mail to the Debtor dated February 28, 2006), P-21 (the Debtor's May 15 e-mail to the Plaintiff, including attachments), P-23 (the "financial statements" the Debtor brought to a May 25th meeting with the Plaintiff and others), P-26 (the Plaintiff's e-mail to the Debtor dated February 24, 2006), P-41 (description of financial statements requested from the Debtor, bearing Kaoru Takahashi's handwritten notes) and P-42 (stock certificates).

[7]      The Debtor admitted D-3 (the Debtor's May 22, 2005 e-mail with attachments to the Plaintiff), D-4 (e-mail from Arlene Ing to the Debtor dated May 27, 2005), D-5 (letter dated May 27, 2005 from the Plaintiff to HRH), D-6 (e-mail dated May 3, 2005 from the Plaintiff to the Debtor and the Debtor's May 31 response), D-7 (e-mail dated June 1, 2005 from the Debtor to the Plaintiff), D-8 (e-mail from the Plaintiff to the Debtor dated June 1, 2005), D-11 (e-mail from the Debtor to Arlene Ing and the Plaintiff dated June 21, 2005), D-12 (e-mail from Arlene Ing to the Debtor and the Plaintiff dated June 21, 2005), D-14 (e-mail from the Debtor to Arlene Ing and the Plaintiff dated June 21, 2006 and Ing's June 21st response) and D-15 (e-mail dated July 12, 2005 from the Plaintiff to the Debtor and the Debtor's July 12th e-mail regarding the same).

[7]      To make these Findings of Fact, I have resolved conflicts in testimony between the Plaintiff and the Debtor on several different points.  In resolving these conflicts, I have considered the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.  These Findings of Fact contain my resolution of the facts material to my legal conclusions. Where it would provide context for the reader, I have set forth in footnotes a description of certain testimony that I have determined not to credit.

A.  **The Plaintiff's Background and Investment Experience**

The Plaintiff, a resident of New York, was 38 years old at the time of trial.  (N.T. 7).

Thus, she was 35 years old in 2005, when the events most relevant to this adversary occurred.

She has a Bachelor of Fine Arts degree from the Parsons School of Design.  (N.T. 7-8).  She is

self-employed as President of her own import/export company, J & R Imex ("J&R").  (N.T. 8, 9).

J&R brokers sales of fabric and/or garment manufacturing from its overseas contacts to its

customers in the 7th Avenue garment district in New York.  (N.T. 8-9, 60-61).  J&R's customers

have included Polo Ralph Lauren, Lilly Pulitzer and Saks Fifth Avenue.  (N.T. 60-61).  J&R's

typical gross annual revenue ranges between one to three million dollars ($1-3 million).  (N.T. 9).

In her role as President of J&R, Plaintiff manages staff, "runs financials", and pays bills.

(N.T. 9).  J&R generates balance sheets, profit and loss statements, accounts payable and

accounts receivable statements and files U.S. tax returns.  (N.T. 59-60).  Additionally, J&R uses

accountants, lawyers, and has a revolving line of credit with lenders to help finance its

operations.  (N.T. 60).

The Plaintiff's prior investment experience consisted primarily of purchasing publicly-

traded securities through an investment broker.  (N.T. 11-12).  She also had some real estate

investments -- specifically, buildings she has rented or sold.  (N.T. 10).

Prior to 2005, the Plaintiff had invested in only one non-publicly traded business.  In

2003, she purchased Avlyn, Inc. an "over-the-counter" fabric company.[8]  (N.T. 11).  Avlyn was

small and family-owned.  The Plaintiff learned through a friend that Avlyn's owners were

---

[8]       The Plaintiff did not explain what she meant by the term "over the counter."

interested in selling.  (N.T. 11-13).  Prior to purchasing Avlyn, the Plaintiff met with its owners,

reviewed the company's balance sheet and negotiated the purchase.  (N.T. 12-13).  She also

spoke with people in industry and checked the owners' credibility by "word of mouth."  (N.T.

13).

> The Plaintiff testified that in her particular niche in the apparel industry, investments are

done somewhat informally and are heavily dependent on word of mouth and on whether

respected people in the industry vouch for the privately-held company's business and business

practices.[9]  This was the only trial testimony regarding industry practice and I will credit it.

## B.  **The Plaintiff and the Debtor Are Introduced**

> The Plaintiff first heard of the Debtor and the Debtor's business, My Favorite Child d/b/a/

Her Royal Highness ( previously identified as "HRH"), through Jane McAndrew ("McAndrew").

(N.T. 13).  At the time, the Debtor was the sole shareholder and owner of HRH, a non-publicly-

traded retail apparel company.  McAndrew was the Plaintiff's business contact, or, buyer, at Saks

Fifth Avenue.  (N.T. 14).  Saks purchased imported fabric from the Plaintiff's business, J&R,

and, over the previous four and a half (4 ½) years, the Plaintiff and McAndrew had established a

professional relationship that the Plaintiff characterized as "very good," "strong" and "ongoing."

(N.T. 14-15).

> In early May 2005, McAndrew invited the Plaintiff to lunch in New York City.  (N.T.

---

[9]      The Plaintiff testified that million dollar or multi-million dollar investments would be
handled differently, but that investments at the level at issue in this adversary proceeding, i.e.,
$300,000.00, were typically handled pursuant to the practices described above.  (N.T. 124-25, 102).

13).   At lunch, McAndrew told the Plaintiff that she had a good friend -- someone she had worked with at Strawbridge & Clothier (a now defunct Philadelphia-area department store) -- that had a very good business idea and needed financial backing.  (N.T. 15).  While the specific contours of this investment opportunity would only be fully drawn over the next few weeks, generally speaking, it involved becoming a shareholder in an existing children's clothing store and investing further capital to launch a privately-labeled wholesale children's clothing line that would be sold in the existing retail store and through other retail outlets.  McAndrew indicated that she intended to be part of the team that worked on the Debtor's wholesale business idea.  (N.T. 15).  She asked the Plaintiff whether she would be interested in meeting and possibly going into business with the Debtor.  (N.T. 13).  McAndrew told the Plaintiff that she could vouch for the Debtor's "credibility as a sound businesswoman." (Id.).

In terms of generating the Plaintiff's interest in investing in the Debtor's business, McAndrew was an ideal first contact.  (N.T. 110).  The Plaintiff "ador[ed]" McAndrew and accorded great weight to her business opinions.   (N.T. 110, 15) ("I wouldn't doubt anything . . . she was saying because we've worked together for $4\frac{1}{2}$ years and . . . she has never proved to be somebody that was dishonest").  McAndrew worked for Saks Fifth Avenue, a company for which the Plaintiff had great respect and with which she did business.  Also, the Plaintiff knew that McAndrew was responsible for launching the Land's End Children's Division and the proposed business investment involved launching a children's clothing line.  (N.T. 15, 110).

The Plaintiff expressed an interest in hearing more about this potential investment idea.

8

**C.  The Debtor's May 15th E-mail Describing  HRH**

On May 15, 2005, the Plaintiff received an e-mail directly from the Debtor.  (N.T. 15).

The e-mail "package" consisted of 6 parts:

1. a cover e-mail from the Debtor that essentially said that she was following up on McAndrew's conversation with the Plaintiff and that she was attaching information about HRH;

2. photographs of the exterior of HRH's retail establishment, located at 20 Haverford Station Road, Haverford, PA 19041;

3. an attachment that broke down HRH's assets, specifically:

| | |
|---|---|
| Inventory | 204,315 |
| Fixtures and Equipment | 122,000 |
| New Store build out | 88,000 |
| Goodwill | 125,000 |
| **Total Assets** | 539,315 |

4. an attachment that broke down projected annual business expenses for various projected sales levels ranging from $750,000.00 to $1.2 million, with projected profits ranging from $10,650.00 to $175,000.00;

5. an attachment that showed HRH's annual sales for 1997 to 2004, broken down by month, and projected sales, by month,  for 2005;[10] and

---

[10]   This document showed that HRH had annual sales of:

| | |
|---|---|
| 1997 | $1,007,362.00 |
| 1998 | 951,643.00 |
| 1999 | 913,149.00 |
| 2000 | 839,013.00 |
| 2001 | 790,434.00 |
| 2002 | 854,257.00 |
| 2003 | 580,018.00 |
| 2004 | 701,878.00 |
| 2005 | 721,387.00 |

See Ex. P-21.

9

6.  a written profile of HRH ("the Profile"), which painted an attractive picture of
HRH.[11]

---

[11]  The Profile stated:

Her Royal Highness is a premium children's clothing boutique that
carries the finest quality children's collections from France, Italy, Germany,
England, Spain, Austria, as well as the United States.  Its commitment to quality,
fashion leadership and customer service has earned international recognition,
numerous awards, and a loyal customer following.  It has won Best of
Philadelphia six times, Best of Main Line Children's clothing five times and has
been mentioned in the Philadelphia Inquirer, regional magazines, as well as the
New York Times and Town and Country.

In 1988, its present owner, Frances Chan, who has a B.S. degree in
design from Cornell University, and years of retail buying and merchandising
experience in New York and Philadelphia, purchased the business and started to
build upon its success.  Through her passion and vision, innovative change and
marketing, creativity and analytical skills, she doubled the business in less than
three years, and then tripled it by 1997.  Her Royal Highness is considered one
of the leading Children's boutiques in the United States.

See Ex. P-21.

In sections titled "Customers" and "Growth", the Profile proclaimed that:

Her Royal Highness is a well-sought destination store for affluent
customers with discriminating taste.  Its exclusive European collections,
such as Burberry, Bon Point, Floriane, Sonia Rykiel, Jean Bourget, Tartine
et Chocolat, Simonetta, consistently draw customers from everywhere.  Its
customer base includes locations in New York, Connecticut, New Jersey,
Washington, D.C., Virginia and as far as Florida and California.  The store has
developed a highly specialized mail order business for these customers,
sending out shipments of new merchandise as soon as it arrives for each new
season.

After successfully running the business for fifteen years, with
steady growth in Suburban Square, Ardmore, the store moved to a bigger,
more prestigious location in Haverford, PA.  The new location, on street level
in a beautiful building of 3,000 square feet also has a basement of 3,000 square
feet used for offices, design work, as well as ample space for shipping and
storage.  Her Royal Highness has always employed the latest retail technology to
monitor sales activity, vendor profitability and identify important client buying
patterns. Many fine European collections have chosen Her Royal Highness first
to launch their lines in the United States such as Burberry, Tartine et Chocolate,
Armani, Escada. Frances has also discovered several talented new designers and

<u>See</u> Ex. P-21.

The Plaintiff understood that the Debtor sent her this information because she was interested in raising capital for her retail store and was in the process of soliciting investors. (N.T. 16, 18-19).  The Plaintiff had a very positive initial reaction to the information that she received from the Debtor.  (N.T. 18-19).

**D.  <u>The May 17th Meeting in Haverford, Pa.</u>**

To further explore this investment possibility, the Plaintiff and Arlene Ing ("Ing"), J&R's Vice President at the time, arranged to meet with the Debtor at the HRH store.  (N.T. 19).  It was the Plaintiff's intention to meet the Debtor and her team.  (N.T. 21).  The Plaintiff wanted to see the Debtor's store, understand HRH's operation, examine the sales floor merchandise and observe the foot traffic in the store.  (N.T. 21)  In short, she made the trip from New York City to the Philadelphia suburbs to get as much information as she could about the Debtor's business operations.  (N.T. 21).

The Plaintiff and Ing were met by the Debtor, McAndrew, a mother and daughter team ("Teresa and Niung") that produced their own line of special occasion dresses called "Little Princess", and Madeline Wolcott ("Wolcott").  (N.T. 19, 20-21).  The Debtor told the Plaintiff that Wolcott had 50 years' experience selling children's wear and had sold European collections

---

featured them to customers through trunk shows.  All of these components work together to make HRH a unique and dynamic store that is now positioned for the next phase of exciting growth, with potential for multi-store operation, and manufacture of it's own brand of high quality children's clothing collection.

<u>See</u> <u>id.</u>

throughout the United States.  (N.T. 20).  Wolcott was present at the meeting to describe the

wholesale, private label market, the kinds of designs that might sell well and to "give credibility

to [the Debtor]."  (N.T. 20).  Teresa and Niung were present to discuss the possibility of

incorporating their ideas into a potential HRH wholesale line.  (N.T. 20).

 The meeting lasted approximately four (4) hours.  (N.T. 21).  Among other things, the

parties discussed the possibility of the Plaintiff becoming an investor in HRH, the responsibilities

of the retail portion of the business (as opposed to the wholesale portion) and the potential for

designing and launching a wholesale line.  (N.T. 21).

 The Plaintiff asked the Debtor about HRH's profitability.  (N.T. 21).  The Debtor told the

Plaintiff that HRH had been a very profitable retail business for a long time.  (N.T. 21).

Explaining the sales figures she had forwarded as part of her May 15th e-mail, the Debtor told the

Plaintiff that she lost a lot of money in 2003 due to expenses associated with moving from one

location (in Ardmore, PA) to another (in Haverford, PA).  (N.T. 21-22).  However, the Debtor

stated that HRH experienced a rebound the following year, with the result being that it lost only

$35,000.00 due to the move, and was back on track to reach approximately $750,000.00 in sales

in 2005.  (N.T. 22).  The Debtor said she expected to make ten percent (10%) of that projected

sales figure in profit for 2005.  (N.T. 22).[12]

---

[12] This profit margin, i.e., ten percent (10%) of gross revenues, was in line with the
Plaintiff's expectations regarding the  profit level for her own business, J&R.  (N.T. 10).  The Debtor
disputed making the representation regarding the ten percent (10%) profit margin.  I also note that the
document projecting income, expenses and profits attached to the May 15th e-mail projects profits at a
rate far below ten percent (10%) for annual sales of $750,000, but does project profits in excess of ten
percent (10%) for annual sales of $850,00 and above .  While I credit the Plaintiff's testimony that the
Debtor orally projected, at least in general terms, a net profit margin of ten percent (10%), this factual
issue is not material to the outcome of this proceeding.  The Plaintiff does not claim that the profit
projection itself was a misrepresentation of fact and, in any event, a nondischargeability determination
under 11 U.S.C. §523(a)(2)(B) requires the use of a materially false statement in writing.  An oral

The Debtor told the Plaintiff that she was looking to raise money -- somewhere between $250,000.00 and $400,000.00 -- to sustain and grow the company. (N.T. 22). The Debtor stated that the investment would be used to: (1) pay current debts and (2) fund future purchases of seasonal inventory. (N.T. 47-48, 68). The Debtor was also interested in partnering with someone who could make the necessary capital investment to permit the design and sale of a wholesale line of children's clothing that would be branded under the HRH name and carry the HRH logo.[13] To this end, Wolcott gave the Plaintiff her word that if she were to invest in HRH, Wolcott would carry the wholesale children's collection in her showroom. (N.T. 20).

During this visit, the Plaintiff asked the Debtor about some of the financial information the Debtor had forwarded in her May 15th e-mail. For example, she questioned the Debtor about how she arrived at the inventory valuation and for the typical mark up of HRH's inventory.[14] (N.T. 122-23). The Debtor told the Plaintiff that the inventory figure was based on the inventory

---

statement regarding expected profits does not suffice.

[13]    The Debtor testified that she was looking for an investor who did not just provide money, but someone who could also bring her connections, knowledge and expertise to bear in helping to grow the HRH business. (N.T. 171). The Plaintiff had factory connections in Asia for manufacturing, and a background in the clothing industry, which made her an attractive investor to the Debtor. (N.T. 171).

[14]    The Debtor testified that the Plaintiff never asked her about inventory valuation, goodwill, build out or any other component of the asset listing for HRH. (N.T. 159-60). I find the Plaintiff's testimony to be more credible on this point. While the Plaintiff had limited experience making these types of investment decisions, see Part III.A., supra (regarding her investment in Avlyn), I credit her testimony that she believed that she needed to know a company's balance sheet information (i.e., assets and liabilities) before she could make a sound investment decision. Additionally, I find the Plaintiff's testimony concerning the questions she asked and the answers the Debtor provided to be plausible and truthful.

that was currently in store.  (N.T. 64)  She also said that she applied a mark up of over 50% to

HRH's merchandise, with an average markup of 54%.[15]  (N.T. 122-23).  The Plaintiff also asked

the Debtor how she valued goodwill in her May 15th e-mail.  (N.T. 67).  The Debtor replied that

she based her valuation of goodwill on her 20-year reputation in the industry and on the fact that

HRH had been successful for most of those 20 years.[16]  (N.T. 67).

Also during her visit, the Plaintiff examined HRH's inventory, fixtures and equipment.

(N.T. 65-66, 121).  At the time, HRH had a "beautiful store" arranged on two levels.  (N.T. 121).

The upper floor, which was the retail selling space, had a full floor of current, spring

merchandise from Burberry and other high-end lines.  (N.T. 121-22).  The currency of the

inventory was important to the Plaintiff because she knew that a past season's merchandise loses

value with the passage of time.  (N.T. 121-22).  In the basement, or bottom level of the store,

HRH had current inventory that had not yet been put on the retail floor and shipments that had

recently been received.  (N.T. 122).

The Plaintiff left the May 17th meeting with very positive feelings about HRH and

enthusiasm about the wholesale concept, but made no agreement at that time to invest in HRH.

(N.T. 24).  The Plaintiff requested HRH's financial statements and balance sheets from the

---

[15]     The Plaintiff also asked the Debtor how she valued build out and fixtures on the asset
report that she attached to her May 15th e-mail and the Debtor told her that these were "true figures"
(presumably, she meant "current figures") because she had just recently moved.  (N.T. 66-67).

[16]     I note that $125,000.00 of the $539,315.00 assets value the Debtor disclosed was
attributed to goodwill.  When asked at trial whether she had an understanding of how one values
goodwill, the Plaintiff said she believed that goodwill was not tangible and that valuation could vary
based on who was doing the valuing.  (N.T. 67).  She further believed that, as an investor, one valued
goodwill based on the seller's statement.  (Id.).

Debtor, but did not receive them that same day. (N.T. 23-24).   The Plaintiff says the Debtor said

she would "have to work on it,"  (N.T. 23-24), while the Debtor claims she told the Plaintiff that

she could come back to HRH any time she wanted to look at its books and records.[17]  (N.T. 144,

163).  The Debtor also told the Plaintiff that she had a lot of other people interested in investing

in HRH, creating pressure on the Plaintiff  to close the deal.  (N.T. 95).

Some time after this meeting on May 17th,  the Plaintiff told the Debtor that, if she were

to  proceed with the investment, she would have to do so in two installments.  (N.T. 188).  She

would need to sell real estate to afford the investment and would have to pay part of the

investment up front and the other part upon the closing of her real estate sale.  (N.T. 165).

### E.  May 19th:  Another Request For HRH's Financial Statements

Following the May 17th meeting, the Plaintiff discussed the HRH investment opportunity

with J&R's accountant, Frank Panzarella ("Panzarella").  (N.T. 24-25).  She showed Panzarella

the listing of HRH's assets that she received as an attachment to the Debtor's May 15th e-mail

---

[17]      The Debtor testified that she told the Plaintiff at this meeting that HRH's accountant's name was Mark Goldberg and that the Plaintiff could obtain any financial records she wanted from him. (N.T. 144).  I do not credit this testimony.  There is no corroborating, circumstantial evidence to suggest that the Debtor ever mentioned Goldberg's name to the Plaintiff.  Instead, there is evidence that, following this meeting, the Debtor had her bookkeeper call the Debtor again (and not Goldberg) to follow up on the request for financial statements.  See Part III.E., infra regarding the May 19th communications.  Later, when post-investment business conditions caused the Debtor to decide to informally audit HRH's books and financial records (see Part III.M., infra regarding the September 2005 activities), she again returned to the Debtor (and not Goldberg) to request access to the records and the Debtor (and not Goldberg) made certain software programs available to the Debtor's bookkeeper in Haverford.  I find it more likely than not that the Plaintiff would have made these requests to Goldberg, or would have contacted Goldberg to ask questions concerning his views about the financial health of HRH, had she been given his name.  That she did not do so suggests to me that she was never given his name.

(i.e., Ex. P-21).  (N.T. 67).  She asked Panzarella what it would cost her to have him review

HRH's financial information and do "due diligence" with respect to the investment.  (N.T. 25).

Panzarella quoted her a fee between $10,000.00 to $15,000.00.  (N.T. 26).  Based on the size of

the proposed investment relative to costs and to assess whether a $300,000.00 investment was

warranted, he suggested that the Plaintiff obtain certain financial statements from the Debtor and

pay particular attention to the balance sheet and the amount of equity in the business,.  (N.T. 25-

26).  He told her "the important thing is what is the equity, what is [sic] the assets, and what are

the liabilities of the corporation . . . ."[18]  (N.T. 25).

Accordingly, on May 19th, the Plaintiff asked her bookkeeper at the time, Kaoru

Takahashi ("Takahashi"),[19] to call the Debtor and specifically request certain financial

statements.  (N.T. 24).  In framing the request for financial information, Takahashi worked from

a document titled "Financial Statements" that described four (4) different types of financial

---

[18]     The Plaintiff also testified that Panzarella told her that

> because it's a privately held corporation, . . .  it's all based on the information
> provided by the owner of the corporation. Therefore, he said even if this
> documentation is based on the fact that was given to him, it's not a publicly
> traded company.

(N.T. 26).

        While the thought is not clearly expressed, I understand the Plaintiff to mean that
Panzarella suggested to her that even if he were to review HRH's financial statements, his review  might
be of only limited value to the Plaintiff because any conclusions he might draw about the financial health
of HRH would depend upon the accuracy of the information the Debtor provided (and one cannot be
certain regarding the accuracy of the information without an audit).


[19]     As of May 2005, Takahashi had worked as a bookkeeper at J&R for approximately ten
(10) years.  (N.T. 131).  As of trial, she no longer worked for the company.  (Id.).

reporting: (1) a balance sheet, (2) a profit & loss statement, (3) an income by product report (described as a "summary of the company's net sales income for each product for the fiscal year-to-date") and (4) an inventory valuation report (described as a "report of current value of the company's inventory based on quantity on hand, cost, retail value . . . .").[20] The document that Takahashi worked from suggested that the various reports be obtained for each of the prior 3 years. See Ex. P-41.

Takahashi contacted the Debtor directly and requested these financial documents concerning HRH. (N.T. 134); see also Ex. P-41 (including Takahashi's handwritten notes). After the call, Takahashi told the Plaintiff that the Debtor said she would bring the requested information to the parties' next meeting, which was scheduled for May 25th.[21] (N.T. 26, 27).

**F.  The May 22nd E-mail:  the "Advisory Board's" Proposed HRH Business Model**

Prior to the parties' next scheduled meeting, the Debtor sent an e-mail to the Plaintiff that attached what she described as the "Her Royal Highness Business Model" ("the HRH Business Model") that the Debtor's "advisory board"[22] recommended. See Ex. D-3. The attachment

---

[20]    It is not clear from the record from whom Takahashi obtained the "Financial Statements" document.

[21]    In contrast to the Plaintiff's and Takahashi's testimony, the Debtor testified that neither the Plaintiff nor anyone from her company ever asked for a complete list of HRH's liabilities prior to May 25, 2005. (N.T. 188-89). Having considered all of the testimony and evidence, I credit the Plaintiff and Takahashi, particularly as their version of the events is supported by contemporaneous notations on written documents. See Ex. P-41.

[22]    The Debtor's e-mails, both before and after the Plaintiff made her investment (see, e.g. Ex. D-3, Ex. P-18, Ex. P-26), include references to her "advisory board" having made certain binding decisions for HRH. At trial, the Debtor admitted that HRH had no corporate "advisory board" in any

17

proposed the creation of two separate business entities -- "HRH Corporate/Retail" and "HRH Wholesale/Mfg."

The HRH Business Model proposed that, following a $300,000.00 investment by the Plaintiff, the Plaintiff and the Debtor would own HRH Corporate/Retail on a 40/60 basis, respectively.  It also proposed that the wholesale line be marketed and distributed through Madeline Wolcott Imports, for which Wolcott would receive a 15% sales commission.[23]  The wholesale collection also would be carried in HRH's "retail stores" and sold to other specialty boutique and department stores.[24]

---

official sense.  Rather, the Debtor simply consulted with family or friends from time to time before making important business decisions.  The Debtor appears to have made the misleading references to an "advisory board" to forestall the Plaintiff's inquiries or to veto the Plaintiff's business ideas.  Only after their business relationship ended did the Debtor reveal to the Plaintiff that she never had an advisory board.  (N.T. 200).

[23]     In the accompanying e-mail, the Debtor referenced the non-existent advisory board, stating:

> After our conversation of Friday PM, I have discussed to [sic] the board your concerns regarding 100% ownership of the wholesale division.  The board would welcome any specific idea you would like to modify or clarify.  For example, how much of the wholesale operation would you like to own? Are you looking for a financial investment in addition to personal commitment (sweat equity) from me right away?  My advisory board wants to create a well defined, clean model to ensure our partnership would work well together.  They are very willing to hear your ideas and wants [sic] to better meet your vision and needs in our business venture.  Please be assured that you can trust them to do what is very fair for both of us.

See Ex. D-3.

[24]     The HRH Business Model also proposed that (1) the parties target wholesale volume between $1,000,000.00 and $3,000,000.00, (2) that the Plaintiff pledge an initial investment of up to $500,000.00 to launch the wholesale line, (3) that the Plaintiff become the exclusive agent, licensee and owner of the HRH private brand, and (4) that the Plaintiff pay a 10% royalty fee to HRH Corporate/Retail for each piece of merchandise produced and sold.

With respect to HRH Corporate/Retail, the HRH Business Model proposed that the Debtor continue her responsibility of buying, merchandising and marketing and work to "improve the profitability of the operation and build on the corporate image of Her Royal Highness."  It also stated that the Debtor would research and develop "new retail stores and launch a franchise operation."  See Ex. D-3.

### G.  The May 25th Meeting in New York City

The parties' next meeting took place at J&R's offices in New York City on May 25th. The Debtor, the Plaintiff, Ing, Takahashi and McAndrew attended.  The purpose of the meeting was to further discuss the Plaintiff's potential investment in HRH.  (N.T. 27).

This meeting lasted approximately two hours.  (N.T. 30).   There was a great deal of discussion about the prospects for launching the wholesale division and "looking at business ideas."  (N.T. 27).

Additionally, the Debtor provided the Plaintiff with what the Plaintiff understood to be the financial documents that Takahashi requested by telephone on May 19th –  in total, 21 pages of documents.  See Ex. P-23; (N.T. 27).  The Debtor told the Plaintiff that the first page in this group of documents was a listing of HRH's liabilities.  (N.T. 28).  In its entirety, this document discloses the following liabilities:

#### Accounts Payable: Inventory

| | |
|---|---|
| Madeline Wolcott | $26,494.54 |
| BonPoint | $43,021.92 |
| Baby Graziella | 5,642.00 |
| Floriane | 10,522.00 |
| Jean Bourget | 8,717.00 |
| Isabel Garreton | 3,859.25 |

| | |
|---|---|
| **Little Princess** | **3,951.00** |
| **Margareta Horn** | **1,061.50** |
| **Sarah Louise** | **1,241.26** |
| **Schoenfelder** | **3,733.38** |
| **Sophie Dess** | **5,095.00** |
| **Wee Ones** | **964.43** |
| ***Total*** | ***$114,303.28*** |

### Accounts Payable: Operational

| | |
|---|---|
| **Rent - April, May, June** | **$25,050.00** |
| **Real Estate Taxes Due landlord** | **2,800.00** |
| **Direct Mail Printing** | **1,799.64** |
| **Accounting and Legal** | **2,325.00** |
| **Technical Support** | **1,800.00** |
| **Payroll** | **3,500.00** |
| **Misc. (Utility, Phone, etc.)** | **4,506.20** |
| ***Total*** | ***$ 41,780.64*** |
| ***Grand Total*** | ***$156,083.92*** |

The Plaintiff asked the Debtor whether HRH had any liabilities other than those listed on the first page of Ex. P-23. The Debtor told her that HRH did not, that this page represented HRH's only liabilities.[25] The Debtor also stated that, if the Plaintiff invested in HRH, the first installment payment would go to pay these debts and the rest would be used to fund purchases of the Fall 2005 and Spring 2006 merchandise. (N.T. 68, 47-48).

The Plaintiff also asked the Debtor about the Accounts Payable entry relating to rent. The entry indicated that rent was payable for April, May and June. (N.T. 118). The Plaintiff

---

[25] This factual finding was the subject of conflicting testimony. The finding is a significant one in this proceeding and is discussed in Section IV.A.1., infra. For the reasons expressed therein, I reject the Debtor's testimony, finding the Plaintiff's testimony to be more consistent with the totality of the evidence and more credible.

20

questioned the past due portion.  The Debtor told the Plaintiff that she had purchased a lot of

merchandise for the season and that money should be coming in as product was sold and that

being behind a month or so in rent "sometimes . . . happens in retail."  (Id.).  The Plaintiff

accepted the Debtor's explanation for the delinquency.

Finally, the Debtor told the Plaintiff that, if she were to invest, the Debtor would need the

Plaintiff's first installment quickly.  (N.T. 90, 144).  Some of the debts on Ex. P-23 were pressing

because the Debtor wanted to pay her vendors in June so as not to have any delay in having the

Fall merchandise delivered in July.[26]  (N.T. 144).

## H.  The May 27th E-mail: Recapping the May 25th Meeting and Planning for the Future

On May 27th, Ing sent an e-mail to McAndrew, the Debtor and the Plaintiff that purported

to "recap" the May 25th meeting.  See Ex. D-4.  The e-mail identifies various "phases" of work

---

[26]      After the Accounts Payable page, the other financial documents provided by the Debtor
on May 25th (Ex. P-23) consisted of the following:

> 1.  an Inventory Report as of May 24, 2005 of the cost and retail markup of
>     HRH's on hand inventory;
>
> 2.  Inventory Sales by Department, broken down by item, for August 2, 2004 to
>     November 30, 2004;
>
> 3.  Inventory Sales by Department, broken down by item, for January 1, 2005 to
>     May 24, 2005;
>
> 4.  Inventory Sold by Class for Fall 2004 inventory; and
>
> 5.  Spring 2005 merchandise on hand and sold from January 1, 2005 through
>     May 24, 2005.

I note that absence of the HRH profit and loss statements requested by the Plaintiff.

required to carry out the Debtor's proposed business plan.

First, Ing noted that the Plaintiff and the Debtor still needed to determine the details of the Plaintiff's investment:  for example, how much she might be willing to invest and what percentage ownership of HRH Corporate/Retail she would receive.  Then, the e-mail observed that, if the Plaintiff were to invest, she would be responsible for designing a small private label collection with a targeted in-store date of August 2005, and provided suggested details regarding labeling and fabric choices.  Finally, Section B of the e-mail identified certain work required of the Debtor.  It stated:

**"Putting the Crown Jewels Back on"**

   – **Frances must work at bringing the "jewels back and onto the crown"**

   – **a detailed proposal/action plan should be made and achieved a.s.a.p. with the possible following suggestions:**

      • **reduce existing "dead" inventory in-store or close out to jobber/Daffy's**

      • **reduce current expenses**

      • **reduce rent**

      • **rework numbers for the buy with the realistic achievable total sales at current location**

      • **reduce the "service" inventory with profit generating inventory**

      • **eliminate buys of "small" lines that do not really make any statement**

      • **introduce Her Royal Highness private label collection as a test in-store for Fall '05 -- target August presentation**

- **have trunk show(s)**

<u>See</u> Ex. D-4.

The Plaintiff's testimony at trial, which I credit, was that Section B referred to ideas for improving HRH's retail performance. The Plaintiff admits knowing that HRH was not doing quite as well at its Haverford location as it had done at its previous location in Ardmore. (N.T. 98). "Putting the crown jewels back on" referred to developing strategies for trying to regain HRH's prior sales levels. (N.T. 98). At the May 25th meeting, the parties discussed that, in 2005, the Debtor was not going to be able to meet the sales numbers HRH achieved at the Suburban Square, Ardmore location in 2003. Accordingly, the parties agreed that the Debtor had to develop realistic numbers for the current location and take steps to reduce expenses. (N.T. 97-101).[27]

## I. The Plaintiff Decides to Invest

### 1. Factors that Motivated the Plaintiff to Invest in HRH

After the May 25th meeting, the Plaintiff reviewed the financial information that the Debtor provided and concluded that HRH was a good investment opportunity. She made this decision after considering a number of variables. (N.T. 29-30, 104-05, 110-14).

She liked the Debtor. She thought HRH's retail store space was beautiful, and, from the information that was provided to her, that the Debtor ran HRH well. (N.T. 110). This

---

[27]    In contrast, the Debtor's testimony was that this e-mail referred to the fact that HRH had lost "a lot of its success, that it was not doing well, and we're hoping to be able to restore the profit by having the wholesale line and develop a wholesale business throughout the country." (N.T. 147).

investment opportunity also came to her "through a really good channel" (Id.)  --  McAndrew

and Wolcott had essentially vouched for the Debtor.[28]

     Additionally, the Plaintiff was very enthusiastic about the notion of taking a store that had

been locally branded for years and that had been very successful for many of those years and

starting a wholesale division of privately-branded, high-end merchandise that could be sold in

that store.  She was attracted to the synergies that could be obtained by vertically integrating the

two businesses.  (N.T. 110-11).  Integrating the wholesale end with the retail part of the business

meant that HRH Wholesale/Mfg. would have an immediate outlet for the privately-branded

merchandise.  (N.T. 112).  Also, retail could sell the wholesale merchandise at a generous

markup, with the integration resulting in higher profits.  (N.T. 111).  The enterprise would further

benefit from Wolcott's firm, verbal commitment to carry the HRH line in her showrooms before

the collection was even started.  (N.T. 111).

     The Plaintiff also gave some consideration to the Debtor's projected profit numbers for

2005.  The Debtor told the Plaintiff that she could expect HRH to make a 10% profit on sales.

(N.T. 102-05).[29]  As a 40% shareholder on the HRH Corporate/Retail side of the business, the

Plaintiff's share would be $30,000.00.  Assuming an increased rate of sales for years after 2005,

the Plaintiff calculated that it would take her five to seven years to make back her $300,000.00

investment (N.T. 104-05), a rate of return that she found acceptable.

     With respect to the financial statements that she had been given regarding HRH, she

---

[28]    As mentioned previously, the Plaintiff had a strong relationship with and great respect
for McAndrew, who was part of the meetings and the "team" since the beginning.  (N.T. 110).

[29]    See n.12, supra.

believed the company to be solvent in the "balance sheet" sense of the term.  (N.T. 29).  In other

words, she believed that HRH's financial condition was such that the sum of its assets at fair

valuation exceeded the sum of its outstanding liabilities.  She reasoned that assets of $539,000.00

and liabilities of $156,000.00 (i.e., the amount disclosed on HRH's Accounts Payable) left

almost $400,000.00 in net equity.  (N.T. 29).  The Debtor had specifically told the Plaintiff that

her $300,000.00 investment would be used to pay the approximately $156,000.00 in liabilities

and to fund purchases of next season's inventory.  (See, e.g., N.T. 114).  If HRH owed

$156,000.00 and she invested $300,000.00, this would leave almost $150,000.00 in working

capital moving forward, an amount she considered good for "a small store in Pennsylvania."

(N.T. 29).

The Plaintiff did not obtain a Dun & Bradstreet report on HRH prior to making her

investment decision.  (N.T. 124-25).  Her unrebutted testimony was that it was not common to do

so in this industry and at this investment level.  (N.T. 125, 102). She described this particular

facet of the apparel industry as being "old-fashioned," testifying that "what we value [is the]

credibility of a corporation."  (N.T. 125).  She also seemed to believe that a Dun & Bradstreet

report would be of limited utility with respect to a company that was not publicly owned and

traded.  (N.T. 125).


## 2.  The Agreement

On or about May 27th, the Plaintiff sent the Debtor a draft agreement that provided for the

Plaintiff to obtain 40% ownership of HRH and to invest $300,000.00 in HRH, to be broken down

into two installment payments:  $150,000.00 by June 1st and $150,000.00 on July 8th.[30]  The

parties were to work together to prepare a more definitive agreement concerning their joint

undertaking.  See Ex. D-5.

Ultimately, however, while the parties reached a final agreement to go forward with their

proposed business partnership on May 31st (see, e.g., Ex. D-6), they never committed their

agreement to writing.  (N.T. 30-31, 112).  While the Plaintiff retained an attorney to assist her in

drafting a written agreement, the Debtor needed the Plaintiff's first installment quickly and

convinced the Plaintiff that involving lawyers in the transaction would only make matters more

expensive.  (N.T. 101-102).  The Plaintiff testified that doing a deal this way was not out of the

ordinary in this industry.  (N.T. 102).

## J.  June 2nd: the Plaintiff Pays the Debtor the First $150,000.00.

On June 2, 2005, the Plaintiff drove to Haverford and gave the Debtor her first

investment check for $150,000.00.  (N.T. 32); see also Ex. P-14.  In return, the Plaintiff received

two stock certificates for 2,000 shares of HRH stock, for a total of 4,000 shares.  (N.T. 32-33).

The parties also discussed their plans for HRH's retail and wholesale operation.  (N.T. 33).

---

[30]      The Plaintiff initially wanted a fifty percent (50%) ownership interest in  HRH
Corporate/Retail in return for her investment.  (N.T. 30).  The Debtor, however, was adamant about
remaining the majority shareholder.  (Id.).  Eventually, the parties reached an agreement that seems to be
essentially in line with the HRH Business Model that the Debtor told the Plaintiff her "advisory board"
had suggested: the Plaintiff would invest $300,000.00 in HRH Corporate/Retail and become 40% owner
of HRH (with the Debtor owning 60% of HRH) and would be the 100% owner of HRH Wholesale/Mfg.,
with an obligation to pay a royalty to HRH Corporate/Retail for each piece of merchandise sold.  (N.T.
31).

**K.  July 14th:  the Plaintiff Pays the Debtor the Second $150,000.00**

On July 12, 2005, noting that the Debtor's second installment was past due (i.e.,it was

originally promised to be paid on July 8th), the Debtor sent the following e-mail to the Plaintiff:

> I have three important collections, Burberry, Jean Bourget, LiLi Gaufrette
> for Fall 2005 that our regular price customers are waiting for their arrival.
> I will miss out being on the first delivery out of Europe if I don't wire the
> money to them by Thursday July 14th to secure the goods getting on the
> plane this weekend.  July 15th-16th is a big shipping weekend for the
> European fall collections.  Our best customers will come in to buy as soon
> as new merchandise arrive in the store.  It will generate great traffic.  I will
> lose important sales if my competition (The Children's Boutique in Philadelphia)
> or the New York stores get delivery before Her Royal Highness does.  Timing
> is everything.
>
> I really hate to ask this, would you be able to wire the money to HRH bank
> account on Thursday morning to expedite things?  Or can you give me a bank
> check so the funds will become available right away when I deposit it
> on Friday morning?

See Ex. D-15.

On July 14th, the Debtor made a wire transfer of the second investment of $150,000.00

(N.T. 34); see also Ex. P-14.

**L.  July 18th: the Plaintiff First Becomes Concerned About Her Investment**

On July 18, 2005, the Plaintiff asked the Debtor for HRH's sales for that month (which,

at that point, was comprised of only two (2) weeks) and was surprised to find that they were very

"weak" -- only $20,000.00.  (N.T. 34).  At that sales rate, HRH would not make even the lower

end of the projected sales figures that the Debtor quoted to the Plaintiff (i.e., $750,000.00).  The

Plaintiff started worrying and spoke to the Debtor who assured her that the current sales were a

product of the summer months and that business typically picked up in August and September

27

and that HRH should be able to make up the numbers.  (N.T. 34).

The Plaintiff, however, started feeling uncomfortable.  (N.T. 34-35). The Plaintiff also noted that following her July investment, the Debtor became markedly less available to her and slow to send her the information she requested -- things that were "important to [the Plaintiff] about the retail operation."[31]  (N.T. 34-35).

Additionally, at some point, the Plaintiff accompanied the Debtor to the Burberry showroom to do the buy for the HRH store.  (N.T. 35).  The Plaintiff became alarmed when she noticed that the Debtor was, in her opinion, spending exorbitant amounts for a buy what seemed more appropriate for a department store than a store of HRH's size.  (N.T. 36).  In response to the Plaintiff's concerns, the Debtor said that she needed to buy more merchandise to make HRH's sales projections.  (N.T. 36) ("She always had very good answers.").

## M.  September 2005:  Takahashi Reviews HRH's Books

Following up on her concerns, in September 2005, the Plaintiff sent Takahashi to HRH to review its books.  (N.T. 36).  The Plaintiff was alarmed by Takahashi's findings.

Takahashi learned that most of the merchandise being sent to HRH was being sent on a C.O.D. basis.  (N.T. 36).  The Plaintiff associated C.O.D. deliveries with companies that had "really bad credit."  (N.T. 36).  She believed most stores do "net 30, so if you order something from a supplier or manufacturer, . . ., they give you net 30 days to pay the invoice due, which

---

[31]     For example, the Plaintiff said that after she made her second installment payment, she sought updated accounts payable, accounts receivable and that "[e]very time [she] asked for it, [the Debtor] gave [her] little pieces here and there but they were never complete.  It was never like full information.  It was never full disclosure."  (N.T. 40).

allows you to sell and be able to take some of that and use it as working capital." (Id.).  She

started to question the Debtor's credibility.  (Id.).  Takahashi's review of HRH's books, which

the Debtor kept on her computer, does not appear to have uncovered any other definitive

findings.[32]


### N.  The Debtor Asks for More Money

The parties' relationship deteriorated over the ensuing months.  (N.T. 37).  Heightening

already existing tensions, at some point after September 2005, the Debtor asked the Plaintiff to

guarantee a $75,000.00 loan with Commerce Bank.[33]  (N.T. 38).  The request escalated to

urgency in February 2006.  (N.T. 38); see Part III.P., infra (regarding the Debtor's February 2006

request).

The Plaintiff was "dumbfounded" by the Debtor's request that she serve as a loan

guarantor.  (N.T. 38-39).  From her perspective, she had just given the Debtor $300,000.00, with

the last infusion of capital just having been made on July 14th.  The Plaintiff could not understand

how the Debtor could need additional money three months or so later. (N.T. 39).  The Debtor

told the Plaintiff that sales were bad and she needed to buy more merchandise - that she needed

to buy more to sell more.  (N.T. 39).

---

[32]     Takahashi told the Plaintiff that the Debtor used Quickbooks for bill paying and a
separate program for inventory and that this made it very difficult to "account for accounts payable and
accounts receivable, . . . especially when you have C.O.D."  (N.T. 37).  She told the Plaintiff that it was
"really hard to figure out the balance."  (N.T. 37).

[33]     The Debtor testified that she did not ask the Plaintiff to guarantee this loan.  (N.T. 176).

**O.  January 2006:  the Wholesale Line is Presented at a New York Trade Show.**

In January 2006, the Plaintiff "launched" HRH's wholesale line by presenting it at the ENK Children's Trade Show in Manhattan.  (N.T. 92-93).  The parties differ in their views of its success -- the Plaintiff says that she took in orders for the HRH wholesale line at the trade show, but that the line still essentially "bombed", while the Debtor says it was a "huge success," taking in over $100,000.00 orders in three (3) days.  (N.T. 92-93, 154).

At some later point in time, the parties had a disagreement regarding whether the Plaintiff should be required to pay HRH Corporate/Retail a 10% royalty on merchandise HRH Wholesale sold during the first two years of operation.  (N.T. 154-55).  In the end, however, it is unclear whether the HRH wholesale line ever resulted in any sales.  At any rate, whatever success the wholesale line might have had, it was not enough to save HRH Corporate/Retail.

**P.  February 2006: the Parties' Relationship Further Unravels.**

The parties met for what the Plaintiff colloquially referred to at trial as the "last supper" in February 2006.  (N.T. 39).  At dinner, the Debtor pressed her request, now urgent, for the Plaintiff to guarantee a loan with Commerce Bank.  The Plaintiff refused.[34]  (N.T. 39-40).  The Plaintiff complained to the Debtor that she was not happy with the Debtor's level of financial

---

[34]      The Plaintiff says a shouting match ensued in which she told the Debtor that she would not guarantee the loan - that she did not feel she knew the "true statement of this corporation."  (N.T. 40). She contends that the Debtor argued that she did not "work for free," that she had been working in retail for a long time and had "a lifestyle to upkeep" and wanted her money.  (N.T. 40).  As discussed earlier, see n.33, supra, the Debtor testified that she never asked the Plaintiff to guarantee this loan.  The Debtor eventually obtained a $75,000.00 loan from Commerce with Thomas Egolf acting as guarantor.  (N.T. 176).

disclosure.  (N.T.  40).  The Plaintiff also observed that she had invested $300,000.00 just a short

while ago and could not understand how HRH could be insolvent by February.  (N.T. 41).  It

appears that around this same time, the Plaintiff also began to urge the Debtor to shut down

HRH's retail store if it could not be operated profitably.

Following this dinner, on February 24th, the Debtor sent the Plaintiff an e-mail telling her,

in part:

> After due consideration with my board, I regret to inform you we decided it is no
> longer in the best interest of the corporation . . . [to grant you exclusivity with
> respect to the wholesale line]. With great power comes . . . great
> responsibilities.
>
> Most unfortunately, our vision and long term growth commitment turned out
> to be worlds apart: as it turns out HRH wholesale appears to be . . . a short term
> project for you for profit . . . .
>
> Her Royal Highness is my life work and the board has set long terms goals for
> me to carry out.  I am confident it can be achieved.
>
> Regarding your 4000 shares of stock, like any shareholder, you are free to sell all
> or part of the stocks you own.

See Ex. P-26; see also n.23, supra (regarding the misleading reference to Debtor's "advisory

board").

The Plaintiff's response was brief:

> I need you to explain this E-mail to me.  Please call me at work . . . .
> I really do not understand.  Very confused.  Thanks.

See Ex. P-26.

An additional e-mail exchange followed concerning whether the Debtor had a realistic

31

plan for turning around the business at HRH.[35]  One of the parties' final written communications

came from the Plaintiff who wrote to the Debtor on February 28th, requesting the opportunity to

communicate directly with the HRH "advisory board."[36]

---

[35]      Specifically, the Plaintiff wrote to the Debtor on February 27th:

> I would like to know if you have a definitive and realistic plan on how
> you will turn the retail operation around.
>
> I cannot stress to you enough that the exclusivity of wholesale and
> manufacturing operation can not be altered in any shape or form from
> the original agreement if I am going to continue this business partnership.
>
> As a 40% partner of the corporation, I need . . . equal access to the Board
> to present my side of the business issues and concerns along with proposed
> resolutions.

See Ex. P-18.

The Debtor responded, in part,

> I have kept you abreast of everything I have done and want to do
>        ebay,
>        landlord's rent reduction
>        1-2 months timeline to close the store.
>        Cutting operating and inventory expenses.
>        Bring in HRH own line at 70-80% margin
>
>        * * *
>
> [T]he board has instructed me to invited [sic] you to present your
> issues and decisions in written form to them which you seemed to
> have dismissed.  You still have the right to exercise that option . . . .

See Ex. P-18.

[36]      The Plaintiff wrote:

> I do understand the plan you have presented however those are not enough or
> appropriate options.  You are still pursuing two separate agenda.
>
> You are pursuing several issues that are going to maintain the store at its

Finally, the Debtor told the Plaintiff in March 2006 that she had investor interested in purchasing the store for $100,000.00 cash if the Plaintiff would vouch for the Debtor's credibility.  (N.T. 42-43).  The Plaintiff refused.  (N.T. 43).  At this time, the Debtor also revealed to the Plaintiff that she never had a formal advisory board.  (N.T. 200).

---

current location with no real change in actual business practices.  Yet you are telling me that you are looking to close the store in one to two months.

- Landlord's rent reduction - Does also mean we will have a clause that will get us out of the lease so another person could take it over if HRH sells the store within the next few months?

- Cutting operating and inventory expenses - How, by what percentage and by when?

- Bring in HRH own line at 70 to 80% margin - How does this figure into the plan of closing the store in 1 to 2 months if the fall line will not be delivered until June?

- Significant losses will be incurred upon closing the store if we simply shut down - Please provide . . . a viable alternative to closing it down.  How can the store become an asset to the corporation instead of a financial liability?  The three items listed are small parts of the plan but not comprehensive enough to turn the operation around.

* * *

In terms of your invitation to present my issues in writing to the board, I want to make sure I have my points formulated in congruent and concise manner before I approach them.

Please provide me with the contact information for the board so I can address the board directly with my response to their decision.

See Ex. P-18.

33

**Q.  The Plaintiff files the District Court Litigation.**

Sometime thereafter, the Plaintiff retained counsel.  She filed the District Court Action

July 21, 2006.  Through the litigation process, the Plaintiff was able to obtain HRH's general

ledger for the year 2005.  (N.T. 43).  She introduced the 2005 ledger as an exhibit at trial.  See

Ex. P-13.

The Plaintiff reviewed the ledger with J&R's accountant, Panzarella.  (N.T. 44).  She

learned for the first time that, contrary to the Debtor's representation, the first page of Ex. P-23

did not fully disclose all of HRH's liabilities.  (N.T. 44, 52).   For example, absent from the

Debtor's liability disclosure, at minimum, is:

1.  a $150,000.00 line of credit from Brown Brothers Harriman.  (N.T. 45; Ex. P-13, page 44);

2.  a $17,175.11 line of credit from Republic First.[37]  (N.T. 45; Ex. P-13, page 44);

3.  an outstanding loan of $11,500.00 from Ian Griffith.[38]  (N.T. 45; Ex. P-13, page 44);

4.  an outstanding loan of $10,000.00 from Thomas and Marie Egolf.[39]  (N.T. 45,

---

[37]     The Plaintiff testified that HRH owed Republic First $17,871.14.  (N.T. 45).  While that appears to have been correct in the beginning of 2005, HRH's general ledger suggests that HRH made payments on this debt obligation in January, February, March and April, thereby bringing down the total amount of this debt, as of May 25, 2005, to $17,175.11.  See Ex. P-13, page 44.

[38]     The Plaintiff testified that the amount of this debt was $12,500.00, but this ignores HRH's payment of $1,000.00 on March 2, 2005, which had the effect of reducing HRH's debt to Mr. Griffith to $11,500.00.  See Ex. P-13, page 44.

[39]     The Plaintiff testified that HRH owed the Egolfs $15,000.00, however, HRH's general ledger suggests that some payments were made on this debt prior to May 25, 2005, which brought down the pertinent level of debt to $10,000.00.  See Ex. P-13, page 44.

48; Ex. P-13, page 44);

5.  an outstanding loan of $20,000.00 from Ken Hua.[40]  (N.T. 45-46; Ex. P-13, page 44);

6.  an outstanding loan of $45,000.00 from Frank and Cindy Wang.[41]  (N.T. 46; Ex. P-13, page 44);

7.  a debt to Petite Faune[42] for $13,227.00. (N.T. 47; Ex. P-13, page 13);

8.  a debt to Advanta for $500.00. (N.T. 47; Ex. P-13, page 13);

9.  a debt to Fidelity Investments for $1,000.00 (N.T. 48; Ex. P-13, page 13);

10.  a debt to AT&T Universal for $1,000.00 (N.T. 50-1; Ex. P-13); and

11.  a debt to Rachel Weissman for $1,037.65.[43]  (N.T. 50; Ex. P-13, page 15).

---

[40]    The transcript refers to this creditor as "Ken Hugh."  The Plaintiff's complaint (see paragraph 23) and HRH's ledger (see Ex. P-13) suggest that the correct spelling is "Ken Hua", however.

The Plaintiff testified that the debt obligations to Hua (item 5) and the Wangs (item 6) were incurred prior to May 25, 2005, and I credit her testimony.  HRH's general ledger reveals that HRH received loans from Hua and the Wangs, and made payments on those loans in July.  See Ex. P-13, page 44.  Although the ledger does not reveal precisely when HRH incurred these debts obligations -- i.e., $20,000.00 to Hua and $45,000.00 to the Wangs -- the Debtor did not rebut the Plaintiff's testimony that they were incurred prior May 25th and a review of the HRH's ledger did not reveal an infusion of capital from these loans in 2005.  (The HRH ledger does reveal the capital infusions the Plaintiff made, for example.)  This leads me to infer that HRH owed $20,000.00 to Hua and $45,000.00 to Wang on May 25th and, most likely, commenced repaying the loans in July.

[41]    See n. 40, supra.

[42]    The transcript refers to this creditor as "Petite Fawn," however, the Plaintiff's complaint (see paragraph 23) and HRH's general ledger (see Ex. P-13) suggest the correct spelling is "Petite Faune."

[43]    The Plaintiff testified that a July 11 payment of $1,021.00 to Rachel Weissman evidenced an outstanding debt to HRH.  In terms of establishing an outstanding debt to Weissman as of May 25th, however, the debt obligation paid on June 23rd, appears to be the more appropriate reference.  See Ex. P-13.

These liabilities alone total $270,439.76.[44]  When added to the liabilities of $156,083.92

disclosed on Ex. P-23, HRH's total liabilities amount to $426,523.68, calling into question

HRH's balance sheet solvency.

On July 31, 2006, the Debtor closed HRH.  (N.T. 178).

The Plaintiff relied on the first page of Ex. P-23 as constituting full disclosure of HRH's

liabilities in making her investment decision.  Knowing the extent of HRH's liabilities was

important to the Plaintiff in making her investment decision.  (N.T. 128-29). If the Debtor had

provided the Plaintiff with a true written report of all of HRH's outstanding debts and liabilities

when she requested them, the Plaintiff would not have invested in HRH.  (N.T. 53, 128).  The

Debtor misrepresented HRH's liabilities when she presented the first page of Ex. P-23

(disclosing only $156,083.92 in debts) as being the only debts that HRH owed.[45]

_____

[44]      The Plaintiff also included a debt to Baby Graziella for $5,315.00 in her itemization of
HRH's undisclosed debts (N.T. 49-50), and observed that HRH made a  payment of $5,315.00 on July
10th  to Baby Graziella.  See Ex. P-13, page 16.  I reject the Plaintiff's contention that this debt was not
disclosed to her.  The written liabilities disclosure that the Debtor provided to the Plaintiff on May 25th
discloses an accounts payable due to Baby Graziella for $5,642.00.  See Ex. P-23.  HRH's general ledger
reveals no payment being made towards this debt before July 10th.  See Ex. P-13.  Accordingly, I infer
that the July 10th  payment was for the $5,642.00 debt disclosed to the Plaintiff on May 25th.

[45]      In addition to contending that the Debtor materially understated the true level of HRH's
outstanding liabilities, the Plaintiff also contends that the Debtor did not spend the Plaintiff's  investment
in the way in which the Debtor represented that she would.  She contends that of the $156,083.92 in
HRH liabilities disclosed on page one of Ex. P-23, only $80,000.00 to $90,000.00 of those debts were
paid with her investment.  (N.T. 82).  The Plaintiff contrasts this contention with the Debtor's
representation that the Plaintiff's investment would pay HRH's outstanding liabilities as disclosed on
page one of Ex P-23 and be used to purchase future season's merchandise.  The Plaintiff also complains
that, during the months that HRH received capital infusions from the Plaintiff's investment, the Debtor
transferred $73,070.14 to herself.  (N.T. 46).  In response, the Debtor asserts that she spent the
$300,000.00 investment exactly as she said she would.  (N.T. 144-145).  She says that, from June 1 to
October 31, HRH paid $242,000.00 in inventory expenses (for both past due inventory expenses and new
inventory) and $152,000.00 in operational expenses.  (N.T. 145).

Because I ultimately decide this adversary on other grounds, I need not resolve this

## IV. <u>CONCLUSIONS OF LAW</u>

One of the Bankruptcy Code's fundamental purposes is to permit honest debtors to

reorder their financial affairs with their creditors and obtain a "fresh start," free from the weight

of oppressive, preexisting debt.  <u>See, e.g.</u>, <u>In re Cohn</u>, 54 F.3d 1108, 1113 (3d Cir. 1995).  In

keeping with this goal, exceptions to discharge are construed narrowly, strictly and liberally in

favor of debtors.  <u>E.g.</u>, <u>id.</u>; <u>accord</u> <u>In re Sandoval</u>, 541 F.3d 997, 1001 (10th Cir. 2008); <u>In re</u>

<u>Ferrell</u>, 2006 WL 1997423, at * 3 (Bankr. E.D. Pa. June 14, 2006).

The Plaintiff's complaint stated causes of action under 11 U.S.C. §§ 523(a)(2)(A),

523(a)(2)(B), 523(a)(4), 523(a)(6) and 523(a)(19).  I begin by analyzing her claim under

§523(a)(2)(B).

### A.    <u>Section 523(a)(2)(B)</u>

Section 523(a)(2)(B) provides that

> a discharge under section 727 . . . does not discharge an individual from any debt -
>
> (2) for money, property, services or an extension, renewal or refinancing of
>     credit to the extent obtained by -
>
>     * * *
>     (B) use of a statement in writing -
>         (i)    that is materially false;
>         (ii)   respecting the debtor's or an insider's financial condition;[46]
>         (iii)  on which the creditor to whom the debtor is liable for such
>                money, property, or services, or credit reasonably relied; and

---

aspect of the dispute.

[46]    In this case, HRH was clearly an "insider", as the term "insider" is used in subsection (B) of §523(a)(2).  "Insider" includes, in the case of an individual debtor, a "corporation of which the debtor is a director, officer, or person in control."  11 U.S.C. §101(31).  It is undisputed that Chan at all times controlled the operations of HRH.

    (iv) that the debtor caused to be made or published with intent to deceive.

To prevail under §523(a)(2)(B), a creditor must prove that:

    1. the debtor made a materially false statement in writing;

    2. the statement concerned the debtor's financial condition;

    3. the debtor made the representation with an intent to deceive the creditor; and

    4. the creditor reasonably relied on the misrepresentation.

E.g., In re Cohn, 54 F.3d at 1114; In re Steele, 2005 WL 281154, at *5 (Bankr. E.D. Pa. Jan. 28, 2005); see also In re Cohen, 334 B.R. 392, 398 (Bankr. N.D. Ill. 2005), aff'd, 2006 WL 4991323 (N.D. Ill. Aug. 7, 2006), aff'd, 507 F.3d 610 (7th Cir. 2007).  The standard of proof under §523(a)(2)(B) is the preponderance of the evidence.  Grogan v. Garner, 498 U.S. at 286-91, 111 S.Ct. at 659-61.

### 1. Materially False Written Statement

The Plaintiff argues that the Debtor made a false written statement when she presented the first page of Ex. P-23 to the Plaintiff as a complete list of HRH's outstanding debts.  The Plaintiff asserts that, at the time the Debtor provided her with this written report, which showed only $156,083.92 in liabilities, the Debtor knew that HRH had, at minimum, $270,439.76 in additional, undisclosed liabilities.  The Plaintiff argues that HRH's indebtedness was material to her decision regarding whether to invest in HRH.

A "statement is materially false if it contains an important and substantial untruth."  In re Masegian, 134 B.R. 402, 405 (Bankr. E.D. Cal. 1991) (citation omitted).  A misrepresentation may be deemed 'material' if credible evidence is presented that the creditor would not have

entered into the subject transaction had the truth been revealed." Id.; see also In re Cohn, 54 F.3d at 1115 ("It is sufficient that the false statement is one that is capable of influencing, or had a natural tendency to influence, a creditor's decision.").  Because the determination of materiality under §523(a)(2)(B) is an objective one, however, a creditor may also succeed in establishing materiality if he or she proves that "the false statement is one that is capable of influencing, or had a natural tendency to influence, a creditor's decision." In re Cohn, 54 F.3d at 1115.  Whether a statement is material is a question of law for the court.  Id.

The Plaintiff says that she made her investment decision based on the Debtor's written representation regarding HRH's financial condition.  Specifically, it was important to her that HRH's financial condition be such that her investment could be used to pay outstanding liabilities and fund future purchases of inventory.  She contends that she acted on professional advice that she make certain that there was sufficient net equity in HRH to cover her investment, and that she would not have invested in a company of questionable balance sheet solvency. Essentially, the Plaintiff asserts that comparing HRH's stated assets of $539,315.00 to its true liabilities of at least $426,523.68 provides a distinctively different equity picture than the one obtained by comparing the assets to the false and materially understated liabilities of $156,083.92.  Additionally, once HRH's complete liabilities are considered, it becomes clear that a $300,000.00 investment would not even begin to cover the company's outstanding debts, let alone fund future purchases of inventory.

The Debtor does not contest the materiality of her disclosures regarding HRH's

indebtedness.  Rather, the Debtor contends that she did not make a false statement.[47]

As stated above in my Findings of Fact, I resolve this factual dispute in the Plaintiff's favor.  Specifically, I find that the Debtor told the Plaintiff that the first page of Ex. P-23 contained a complete listing of HRH's liabilities (and that those liabilities consisted solely of operational and inventory-related accounts payable) and, as such, a listing of the bills that the Plaintiff's first investment check would pay.  I reach this conclusion for a number of reasons.

First, the documentary evidence establishes that, prior to the May 25th meeting, the Debtor had described HRH to the Plaintiff in fairly glowing terms.  In particular, I refer to the May 15th e-mail.  See nn. 11-12, supra & accompanying text.

Second, the evidence establishes that, prior to the May 25th meeting, the Plaintiff (or Takahashi acting on the Plaintiff's behalf) was pressing requests for copies of HRH's financial statements or balance sheets.  The Plaintiff's testimony was emphatic and convincing that, at minimum, she believed she needed to know HRH's assets and outstanding liabilities to be able to make a sound investment decision.  The evidence does not suggest that anything occurred at the May 25th meeting that would have sidetracked the Plaintiff from following through on her intention of obtaining full disclosure of HRH's liabilities.  Yet, following this meeting, the

---

[47]    She testified that on May 25th (the date when the parties had their second meeting in New York City and the Plaintiff expected the Debtor to arrive with the financial statements she had requested), she told the Plaintiff that, although previously successful,  HRH was not doing well and was "bleeding" money.  (N.T. 142, 147).  She says she advised the Plaintiff that HRH was doing "terribly" at its new location and that she needed $300,000.00 because she was "out of money" and could not pay HRH's bills -- she needed the money to pay creditors and become solvent.  (N.T. 142-43, 161).  The Debtor claims that, when she handed Ex. P-23 to the Plaintiff, she told the Plaintiff that the first page was a list of bills she needed to pay immediately, not a complete list of all of HRH's outstanding obligations or liabilities.  (N.T. 165).  The Debtor contends that the Plaintiff never asked for complete disclosure of HRH's liabilities; accordingly, she never provided such a statement.  (N.T. 188-89).  Nevertheless, the Debtor testified that she believed that, after May 25th  meeting, the Plaintiff had an accurate understanding of HRH's existing financial condition.  (N.T. 162).

Plaintiff ceased making requests for complete disclosure of HRH's liabilities and decided to go ahead with her investment.  I find that,  more likely than not, this was because the Debtor gave her Ex. P-23 at the May 25th meeting and said that page one listed all of HRH's outstanding liabilities.

Third, the understated liability disclosure (page one of Ex. P-23) is consistent with the overall tenor of the Debtor's presentation to the Plaintiff, a presentation in which the Debtor pitched HRH as a highly desirable investment opportunity, albeit a company suffering from a short term cash flow shortage.  In this respect, I find it significant that the Debtor suggested to the Plaintiff that she was in competition with others with respect to this investment opportunity. Disclosure of the omitted liabilities would have made it much more difficult to make this type of presentation.

Fourth, the understated liability disclosure was consistent with the information the Plaintiff would have expected to see given the Debtor's statements regarding the proposed use of the funds being invested.  The Debtor told the Plaintiff that her $300,000.00 investment would be used to pay HRH's then-outstanding debt obligations and to purchase future Fall 2005 and Spring 2006 merchandise.  Outstanding liabilities of $156,083.92 (the amount disclosed on HRH's Accounts Payable report) would leave $143,916.08 for future merchandise purchases. Outstanding debt of $426,523.68 (an amount that includes certain undisclosed liabilities) would dwarf the investment.

Based on the evidence I heard at trial, I believe that the Debtor depicted HRH as a sound business with a long track record of success that was experiencing recent cash-flow difficulties

that were expected to be short-lived.[48]  This caused the Plaintiff to be genuinely enthusiastic

about the business opportunity that the Debtor and McAndrew et al. presented to her.  I do not

believe that the Plaintiff would have been enthusiastic about investing hundreds of thousands of

dollars into a retail operation that lacked the equity cushion she believed she needed to provide

security for her investment.   As excited as the Plaintiff may have been about the hoped-for

synergy between the retail and wholesale divisions of HRH, her concern that there be an equity

cushion strongly suggests that HRH's total assets and total liabilities were two (2) pieces of

information critical to her evaluation of the investment opportunity. Given her mind set, I

consider it unlikely that at the May 25th meeting, the Plaintiff would have been satisfied with a

list of "immediately payable liabilities," as opposed to "total liabilities."  This supports my

conclusion that the Debtor presented Ex. P-23 to the Debtor as a statement of total liabilities.[49]

In the end, to adopt the Debtor's version of what happened at the May 25th meeting, I

would have to accept testimony that I simply do not find credible.  Namely, I would have to find

---

[48]      The Plaintiff's testimony, which I credit, was that the Debtor told her that HRH had
experienced a reduction in sales since moving to its new location.  The Debtor attributed part of that fall
off in sales to unexpected expenses associated with the move.  It also appears that rent was higher at the
Haverford location than at the HRH's previous location in Ardmore.  The parties believed that in 2005,
HRH could not realistically hope to achieve the level of sales HRH obtained at its prior location (i.e.,
2002's $854,257.00).  Hence, in Ing's pre-investment "Putting the Crown Jewels Back On" e-mail (see
Ex. D-4), the parties collaborated on generating ideas to help HRH become more profitable -- e.g.,
negotiate a reduction in rent, rework the buy, reduce "dead" inventory, eliminate buys of "small" lines
that do not make a statement.  See Ex. D-4.  However, the Debtor also told the Plaintiff that HRH was
rebounding and on track to make at least $750,000.00 in 2005.

[49]      While the Debtor contends that the Plaintiff was so mesmerized by the notion of
launching a wholesale children's clothing line that she simply did not care about the retail end of HRH,  I
do not find that contention to be consistent with the evidentiary record.  I credit the Plaintiff explanation
at trial that she thought she was investing in a fundamentally sound retail business that could be used as a
platform for a vertically integrated company that included a wholesale children's line sold under the
HRH logo.

that on May 25th, the Debtor revealed to the Plaintiff, for the first time, that HRH's immediate

payables alone (as provided on HRH's Accounts Payable report) would consume completely the

Plaintiff's proposed initial investment installment of $150,000.00 and that, nonetheless, the

Plaintiff stopped pressing her request for full disclosure of HRH's total liabilities, asked no

further questions, solicited no other advice, and simply went ahead with her investment.  I find

that scenario implausible.

Finally, in accepting the Plaintiff's version of the May 25th meeting, I am also influenced

by the fact that there is evidence in the record of other instances in which the Debtor presented

incomplete or "slanted" information to the Plaintiff to gain advantage in their negotiations.  See,

e.g., n.22, supra (regarding the "advisory board").

Consequently, I find that the Plaintiff has met her burden in proving that the Debtor told

the Plaintiff that the first page of Ex. P-23 comprised a complete accounting of HRH's liabilities,

that some of the debts on Ex. P-23 were pressing, and that the Debtor was going to use the

Plaintiff's first installment to pay the debts listed on Ex. P-23 (hence the reference to the June

2005 rent, which was not yet due).  Further, I find that the Debtor's written disclosure contains a

materially false statement of HRH's liabilities because it failed to disclose, at minimum, an

additional $270,439.76 in liabilities.  I find that the Plaintiff would not have invested in HRH had

she known the true amount of HRH's liabilities and that, from an objective standpoint, the

Debtor's false statement concerning HRH's liabilities is of the sort that would tend to influence a

creditor's investment decision.

43

**2.**      **Respecting the Debtor's Financial Condition**

That the Debtor's written disclosure of HRH's liabilities concerned the Debtor's (or an insider's) financial condition is not disputed.  I find that the Plaintiff has satisfied this element under §523(a)(2)B).

**3.**      **Intent to Deceive**

Because a debtor will rarely admit to an intent to deceive a creditor, courts are permitted to infer that a debtor made a false statement with the intent to deceive from the totality of the circumstances. E.g., In re Cohn, 54 F.3d at 1118-19 ("[A] creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of information in the financial statement of the debtor when the totality of the circumstances supports such an inference.").

In this proceeding, the Plaintiff demonstrated by a preponderance of the evidence that the Debtor acted with the requisite intent to deceive.  As HRH's sole shareholder and business owner at the time she made the written disclosure regarding HRH's debt obligations, the Debtor was intimately acquainted with HRH's liabilities.  Her failure to include all of HRH's liabilities on HRH's written liabilities disclosure constituted willful non-disclosure.  I find it more likely than not that, eager to find an investor to help save HRH, the Debtor deliberately omitted certain debts and outstanding loan obligations from the report she gave to the Plaintiff for the purpose of inducing the Plaintiff to invest in HRH.  That the Debtor hoped that the Plaintiff's investment, combined with a successful launch of HRH's wholesale line, would be sufficient to turn things around at HRH and obviate the need for her to ever make full disclosure to the Plaintiff, does not

alter the existence of the Debtor's deceptive intent.

In reaching this conclusion, I am also influenced by the nature of the disclosures the Debtor made to the Plaintiff in the May 15th e-mail (Ex. P-21).  In that e-mail, the Debtor projected profits and estimated expenses for HRH for each potential level of sales for 2005. While this document factors in a whole host of different categories of expense (e.g., supplies, travel, advertising, legal, merchandise display, rent, telephone, electric, water, trash, insurance, donations, u.p.s., sales tax, payroll, visa/mc/amex fees, bank fees, cost of goods), nowhere did it disclose HRH's obligation to repay its outstanding obligations to its lenders.  Consideration of the May 15th e-mail, combined with P-23 disclosure on May 25th,  leads me to conclude that the Debtor intentionally and consciously presented to the Plaintiff, in writing, a materially false picture of HRH's financial condition.

### 4.    Reasonable Reliance

Finally, to succeed in proving nondischargeability under §523(a)(2)(B), the Plaintiff must prove that she actually relied on the Debtor's false statement of HRH's liabilities and that her reliance was "reasonable."  See In re Cohn, 54 F.3d at 1115.[50]

---

[50]    This requirement is in contrast with the "justifiable" reliance required by §523(a)(2)(A). See generally Field v. Mans, 516 U.S. 59 (1995).

In Field, the Supreme Court speculated that Congress adopted a reasonableness requirement when written statements of financial condition are at issue to "moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by the practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge."  Field, 516 U.S. at 76.  In so finding, the Court quoted the following passage from the House Report accompanying the 1978 Act that imposed the reasonableness requirement:

I have no trouble concluding that the Plaintiff actually relied on the Debtor's false statement of HRH's liabilities.[51]  The closer question is whether her reliance was reasonable.

A creditor's reliance is "'reasonable' under §523(a)(2)(B) only if a prudent person in the creditor's position would have relied on the misrepresentation." In re John J. Bones, 395 B.R 407, 432 (Bankr. E.D. Mich. 2008) (quoting In re Green, 240 B.R. 889, 893 (Bankr. N.D. Ohio 1999) (citing Field v. Mans, 516 U.S. 59,77 (1995)).  The reasonableness of a creditor's reliance under §523(a)(2)(B) is judged by an objective standard.  Reasonable reliance is "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." In re Cohn,54 F.3d at 1117.

According to our Court of Appeal's instructions in Cohn, in making this determination,

---

It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding.  While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge.  The forms that the applicant fills out often have too little space for a complete list of debts.  Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts.  Then, at the bottom of the form, the phrase 'I have no other debts' is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting.' H.R. Rep. No. 95-595 pp. 130-131, U.S. Code Cong. & Admin. News 1978 pp. 5787,6091 (footnote omitted).

Id. at 77 n.13.

[51]     The Debtor argued that there was no actual reliance  –  that the Plaintiff was so focused on the opportunity to launch a wholesale children's line of clothing that she simply did not care about how the retail end of the business was doing.  See, e. g., N.T. 141-142 (Plaintiff's trial testimony that 95% of the parties' discussions focused on the wholesale line and 5% on the retail business).  Based on the record and my assessment of the Plaintiff when she testified at trial, however, I find that the financial health of HRH "retail" was important to the Plaintiff.  While she undoubtedly was excited about the wholesale end of the business, she was equally excited about the potential for vertically  integrating the two (2) parts of the business.  A failing retail business would not offer that opportunity.  Further, she believed that the favorable balance sheet reduced her investment risk.

courts should consider three factors:

1. the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices);

2. the standards or customs of the creditor's industry in evaluating credit-worthiness (i.e., what is considered a commercially reasonable investigation of the information supplied by the debtor); and

3. the surrounding circumstances existing at the time of the debtor's application for credit (i.e., whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.)

Id. at 1117.

### a.  the Plaintiff's Standard Practices

In this case, the Plaintiff has had only one other experience investing in a privately-owned company, i.e., investing in Avlyn.  She does not appear to have been "in the business" of investing small, closely held businesses and therefore, she would not have developed "standard practices" in the sense described in Cohn.  Consequently, this factor is not particularly significant in this case.

To the extent that the Plaintiff's experience investing in Avlyn is relevant, however, she appears to have followed the same general practice she used in assessing whether to invest here as she did with Avlyn.  That is, she obtained and reviewed a written statement of the company's assets and liabilities from the company's owner and gathered further information by word of mouth.  Here, McAndrew vouched for the Debtor and the involvement of McAndrew and Wolcott (if not also Teresa and Niung) lent credibility to the Debtor and her investment idea.

47

Additionally, the Plaintiff obtained a list of HRH's assets (Ex. P-21) and liabilities (page one of Ex. P-23) from the Debtor prior to making her investment decision.

### b.   the Industry Practice

Regarding the standard practice in the industry for evaluating this type of investment, neither side offered any expert testimony regarding industry custom.  The Plaintiff proffered her own testimony that investors determining whether or not to contribute capital infusions to privately-held companies in this particular facet of the garment industry and at or around this dollar amount regularly proceed in accordance with the practices the Plaintiff followed here.  The Debtor offered no evidence to rebut the Plaintiff's testimony.

On the whole, I find the Plaintiff's testimony about the industry practice to be plausible. In the absence of any contrary evidence, I will credit her testimony on the issue.

### c.   "Red Flags"

Lastly, I am required to consider whether there were any "red flags" that would have alerted an ordinary prudent lender to the possibility that the financial information that the Debtor supplied was inaccurate.

The Debtor argues, with at least some plausibility, that the Plaintiff's reliance on the Debtor's written disclosure of HRH's liabilities was unreasonable, pointing primarily to two (2) facets of the Debtor's financial disclosure:

(1) the asset report the Debtor provided to the Plaintiff for HRH, which showed

48

that the company had no cash (i.e., there was no entry for cash);[52] and

(2) HRH's Accounts Payable report, which included an entry for two months past due rent.

The Debtor suggests that these factors should have caused a reasonably prudent investor to conduct further inquiry before relying on the report that the Debtor gave to the Plaintiff concerning HRH's liabilities.

While I agree that these two (2) factors might signal to a prudent investor that HRH had a need for an infusion of capital as well as, perhaps, a need to reduce expenses or increase sales[53] – and, perhaps as well, that there was a meaningful degree of risk involved in this investment – I do not believe that it necessarily follows that, upon ready disclosure of a weak cash position and a rent delinquency, the reasonably prudent investor would feel compelled to question the truthfulness of the owner's written disclosure of the business' total liabilities.

In evaluating the Debtor's argument, it is critical to remember that the reasonableness issue under §523(a)(2)(B) is not whether it was reasonable for the Plaintiff to have invested in the Debtor's business, but whether it was reasonable for her to have relied upon the Debtor's statements that HRH had only $156,083.92 in liabilities without making further inquiries before deciding to invest.  See, e.g., In re Braathen, 364 B.R. 688, 701 (Bankr. N.D. 2006) ("The issue of reasonableness presented under section 523(a)(2)(B) is not whether it was reasonable for the

---

[52]     The Plaintiff testified that she was not concerned that there was no cash listed on HRH's asset report because her subsequent visits to HRH confirmed that there was current season's inventory (presumably items that could be sold and transformed into cash) and an impressive store.  (N.T. 119-120).

[53]     These are the types of concerns and suggestions made in Ing's "Putting the Crown Jewels Back On" e-mail (Ex. D-4),

49

Bank to have loaned the Debtor money, but whether it was reasonable for the Bank to have relied upon his statement that he had $4,000 worth of tools in extending him credit").

Importantly, here, when the Debtor gave the Plaintiff her written disclosure of HRH's liabilities, the Plaintiff already understood that HRH had a need for cash because some of its debts were past due.  As such, rather than raising a "red flag" that something was not right about the first page of Ex. P-23 (for example, that there must be more debt than was disclosed), the absence of an entry for cash on the asset report and the existence of an entry for past due rent were <u>consistent</u> with the financial picture of HRH that the Debtor had already drawn for the Plaintiff.  Indeed, one might argue that an investor could interpret the fact that HRH's asset and liabilities reports included details like past due rent and the absence of cash as indicia that the Debtor was being <u>completely forthright</u> and providing the full disclosure the Plaintiff requested – the opposite of a "red flag."  To raise a red flag so as necessitate further investigation, this information would need to have been either internally inconsistent or inconsistent with other information provided to the Plaintiff by the Debtor.[54]  I do not find that the disclosure that a business is out of cash and is delinquent in its rent must necessarily cause a reasonable investor

---

[54]     Similarly, while I recognize that the Plaintiff received page one of Ex. P-23 in response to her request for HRH's balance sheet, I credit her testimony that she accepted Ex. P-23's statement of HRH's total outstanding liabilities and Ex. P-21's statement of HRH's total assets, together, to comprise HRH's "balance sheet."  I do not find that this mode of presentation, alone, and under the circumstances of this case, raised a "red flag" as to the accuracy of the Debtor's written disclosure concerning HRH's liabilities.  Had the Debtor stapled her written disclosure of HRH's assets (<u>see</u> Ex. P-21) to her disclosure of HRH's liabilities (<u>see</u> Ex. P-23) or combined them all on one page, the Plaintiff would still have been left with the same materially understated statement of HRH's liabilities.

Further, while the evidence suggests that the Debtor's May 25th financial disclosure did not include the requested profit and loss statements, <u>see</u> n. 26, <u>supra</u>, based on the totality of the record, I am unwilling to conclude that the Debtor's failure to provide this information, by itself, was sufficient to render "unreasonable" the Debtor's reliance on the other written financial information provided.

to question the accuracy of a separate disclosure of the business' total liabilities.

The Debtor also argues that two other factors should have raised "red flags" for the Plaintiff.   First, the Debtor contends that an accounts payable of $156,083.92 was a rather large sum for a company that was projecting $750,000.00 in sales and that this should have caused the Plaintiff to doubt the Debtor's financial disclosure.  However, the Debtor failed to sufficiently develop this point at trial.  It may or may not be the case that"high-end" children's clothing retailers regularly have outstanding payables of twenty percent (20%) of its projected annual sales at particular times in the year.  There being nothing in the record to permit me to determine whether a reasonably prudent investor would consider this level of indebtedness unduly large for a company of HRH's nature and size, I decline to find that this disclosed debt level was a "red flag" regarding the accuracy of the disclosure of HRH's total liabilities.  Further, even if the ratio of outstanding payables to projected annual sales was unduly high, that suggests only that the business was in distress.  It does not suggest that the liabilities being disclosed are understated.

Second, the Debtor argues that the Plaintiff knew that HRH moved in 2003 and that HRH lost money the year after its move (2004), and that these recent financial losses are sufficient "red flags" to cause a prudent investor to make certain to inspect a company's books and records, rather than rely on the owner's written statement of the company's liabilities.  However, the disclosure of losses in 2003 accompanied by a plausible explanation (i.e., the disruptions and expenses caused by the relocation) was consistent with the overall financial picture of HRH that the Debtor presented and, in the overall circumstances of this case, is not a "red flag" sufficient to have created a further burden of inquiry on the Plaintiff.

Finally, I am influenced in my determination that the Plaintiff's reliance was reasonable

by the fact that, in the circumstances here, the Plaintiff had good reason to trust the Debtor.

McAndrew, whom she greatly respected and knew for many years, personally vouched for the

Debtor and promised to be personally involved in the new HRH wholesale "team."  The Plaintiff

had reason to accord great weight to McAndrew's opinion.  Wolcott, who was in the business for

over 50 years, also lent credibility to the Debtor by promising to assist HRH in launching its

wholesale line.[55]

Accordingly, and in sum, I find that the Plaintiff has established that her reliance on the

truthfulness of the Debtor's written liability disclosure  in making her investment decision was

reasonable.

Having established, by a preponderance of the evidence, all of the required elements to

prevail on a §523(a)(2)(B) cause of action to except a debt from discharge, the Plaintiff is entitled

to a determination that the Debtor's debt to her is nondischargeable.[56]


## V.  REMEDY

The final remaining question is whether, in addition to ruling that the debt the Plaintiff

seeks to except from the Debtor's discharge is nondischargeable, I should also liquidate that debt

and enter a money judgment in the Plaintiff's favor, as she requests.  The Debtor opposes the

---

[55]    According to page one of Ex. P-23 (HRH's Accounts Payable), Wolcott was also a
creditor of HRH.  That a creditor of HRH was also vouching for the Debtor may well have provided
additional reassurance to a reasonably prudent investor's assessment of the Debtor's credibility.

[56]    The term "debt" is used here as a term of art.  The Code defines a debt as the "liability
on a claim."  11 U.S.C. §101(12).  The Code's definition of "claim" includes claims that are "disputed."
Id. §101(5).  Thus, even if nondischargeable, it is theoretically possible for a debtor to contest liability on
a debt determined to be nondischargeable by a bankruptcy court.  See also Part V., infra.

Plaintiff's request.

Courts have differed on the question of whether a bankruptcy court has subject matter jurisdiction to enter a money judgment in an adversary proceeding concerning exceptions to discharge.[57]  One court that reviewed the divided approach to this issue noted that decisions in this area have fallen into two general areas, with the majority of courts adopting  an "expansive approach" and a minority adhering to a "limited jurisdiction" approach.  See In re Cambio, 353 B.R. at 32-33:

> Generally, courts that routinely enter money judgments on nondischargeable debts focus on the close factual and logical relationship between the dischargeability proceeding and any proceeding on the underlying debt, and rely on theories of judicial economy and the bankruptcy courts' inherent equitable powers.  See, e.g., [In re Kennedy], 108 F.3d at 1017-18 (concluding that bankruptcy courts have jurisdiction to determine money damages because "'it is impossible to separate the determination of the dischargeability function from the function of fixing the amount of non-dischargeable debt,' and 'equitable jurisdiction attaches to the entire cause of action'"); Hallahan, 936 F.2d at 1508 (finding that because parties properly before courts of equity subject themselves "to all the consequences that attach to an appearance," the amount of the nondischargeable debt is properly determined by the bankruptcy court).
>
> Courts adopting a limited jurisdiction approach conclude that bankruptcy courts do not have the power to enter money judgments on nondischargeable debts.  See, e.g., [In re Thrall], 196 B.R. 959 (Bankr. D. Colo. 1996); see also

---

[57]        Compare In re Kennedy, 108 F.3d 1015, 1017-18 (9th Cir. 1997) (concluding that a bankruptcy court has jurisdiction to enter a money judgment in conjunction with a finding that a debt is nondischargeable); In re McLaren, 3 F.3d 958, 966 (6th Cir. 1993) (same); Matter of Hallahan, 936 F.2d 1496, 1507-1508 (7th Cir. 1991) (recognizing bankruptcy court's jurisdiction to enter money judgment for claim found to be excepted from discharge); In re Lang, 293 B.R. 501, 517 (B.A.P. 10th Cir. 2003) (concluding that a bankruptcy court has jurisdiction to award money damages in §523(a) cases); Matter of Valencia, 213 B.R. 594, 596 (D. Colo. 1997) (same); Harris v. U.S. Fire Ins. Co., 162 B.R. 466, 468 (E.D. Va. 1994) (same) with In re Cambio, 353 B.R. 30 (B.A.P. 1st Cir. 2004) (bankruptcy court did not have jurisdiction to enter money judgment on nondischargeable debt in chapter 7 case in which there was no estate property available for distribution to creditors); In re Losanno, 291 B.R. 1 (Bankr. D. Mass. 2003) (bankruptcy court does not have jurisdiction to enter money judgment in nondischargeability action); In re Thrall, 196 B.R. 959 (Bankr. D. Colo. 1996) (same).

[In re Losanno], 291 B.R. 1 (Bankr. D. Mass. 2003) (bankruptcy courts lack authority to enter money judgments in nondischargeability cases); [In re Hamilton], 282 B.R. 22 (Bankr. W.D. Okla. 2002) (same); [In re Barrows], 182 B.R. 640, 653 (Bankr. D. N.H. 1994) ("Once a nondischargeability determination is made with regard to educational loans . . . the entry of a money judgment and any repayment terms should be left to the affected parties in the first instances, and, if enforcement is required . . . should be left to a court of competent jurisdiction as would have occurred had there been no bankruptcy.").  These courts generally conclude either that the entry of a money judgment is outside the scope of the bankruptcy courts' jurisdiction or that awards of monetary damages raise other issues appropriate only in a non-bankruptcy forum.  See Thrall, 196 B.R. at 963-64.[58]

Id.

　　　　Our Court of Appeals has not yet ruled on this issue.[59]

---

[58]　　　For example, in Thrall, the bankruptcy court determined that it did not have jurisdiction to enter money judgments based on its conclusions, inter alia, that:

>　(1) Because Congress did not specifically direct bankruptcy courts to render judgments on nondischargeable debts and enforce them [in 11 U.S.C. §523 or Bankruptcy Rules 4007 and 7001(6)], as it had in § 17(c) of the [former Bankruptcy Act], it appears that it did not desire them to do so.

>　(2) Under the Code, determination of dischargeability is a limited function. It does not resolve the entire controversy between a debtor and a creditor within the bankruptcy process and does not necessarily duplicate the cause of action brought outside of bankruptcy.

>　(3) [Building upon rationale no. 2], [t]he parties, defenses, and standard of proof are not necessarily the same in §523 proceedings as they would be in actions pursued outside of bankruptcy.

>　(4) The current jurisdictional grant does not authority to bankruptcy courts to enter final money judgments as part of the dischargeability determination.

In re Thrall, 196 B.R. at 964-973.

[59]　　　One decision involving §523(a) bears mention, however.

　　　　In In re Cohen, a bankruptcy court determined that a debt a landlord owed to his tenants was nondischargeable under 11 U.S.C. §523(a)(2)(A) and then proceeded to have a hearing to determine

Assuming, without deciding, that I have jurisdiction to enter a money judgment in nondischargeability actions,  I do not find it appropriate to do so in this case for the reasons expressed in In re Shapiro, 188 B.R. 140, 149 (Bankr. E.D. Pa. 1995) and In re Stelweck, 86 B.R. 833, 844 (Bankr. E.D. Pa. 1988), aff'd, 108 B.R. 488 (E.D. Pa. 1989).  Indeed, as discussed earlier, in my February 15, 2007 Order, I dismissed the Debtor's Counterclaim and Third Party Complaint without prejudice.  As a result, I do not have the entire controversy before me.  That is reason alone to defer to another court.  Any entitlement the Plaintiff may have to a money judgment against the Debtor is best and properly determined by a court of competent jurisdiction, which may consider the claims that were previously excised from consideration in this adversary proceeding as well as the Debtor's counterclaim and third party complaint.[60]

---

damages and the applicability of the New Jersey Consumer Fraud Act ("NJCFA").  See 185 B.R. 180 (Bankr. D.N.J. 1995), aff'd, 191 B.R. 599 (D.N.J. 1996), aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213 (1998).  The plaintiffs in Cohen apparently asserted that they were entitled to damages under the NJCFA in their ad damnum clause in their nondischargeability complaint. 185 B.R. at 182, n.2.

Following the damages hearing, the bankruptcy court entered a judgment "reflecting treble damages in the total amount of $94,147.50, as apportioned to each plaintiff based on the stipulated amounts of rental overpayments, plus reasonable attorneys' fees and costs to be fixed by the Court."  Id. at 190.  The Cohen opinion was affirmed by the district court (see 191 B.R. 599 (D.N.J. 1996), the Third Circuit Court of Appeals (see 106 F.3d 52 (3d Cir. 1997), and United States Supreme Court (see 525 U.S. 213 (1998)).

Jurisdiction to enter judgment was not questioned by the district court, the Third Circuit, or the Supreme Court.  In light of my decision declining to exercise jurisdiction to enter a money judgment in the Plaintiff's favor, I need not consider whether the Court of Appeals and the Supreme Court have held, sub silentio, that bankruptcy courts have jurisdiction to enter money judgments in nondischargeability proceedings.  See generally Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 127 S.Ct. 1184 (U.S. 2007) (a federal court may choose among threshold grounds for declining to decide a case on the merits and, if it does so, need not necessarily determine whether it has subject matter jurisdiction).

[60]      As a practical matter, whether the Debtor can continue to contest her liability and defeat the Plaintiff's efforts to obtain a post-bankruptcy money judgment against her and the scope of any future litigation between the parties likely depends on: (1) the degree to which collateral estoppel applies to the

55

## VII.  <u>CONCLUSION</u>

For the reasons set forth herein, I find, by a preponderance of the evidence, that the

Debtor's debt to the Plaintiff is nondischargeable under 11 U.S.C. §523(a)(2)(B).

An Order in accordance with this Memorandum will be entered.

Date:   <u>December 30, 2008</u>          _____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

issues decided in this adversary proceeding, <u>i.e.,</u> whether issues necessarily determined here satisfy the
elements of the Plaintiffs' claims arising under applicable nonbankruptcy law by the requisite standard of
proof and (2) the merits of the Debtor's counterclaim and third party complaint.  These are issues for
another court.